Terry L. JONES, et al., Plaintiffs,

v.

UNITED STATES of America, Stephen L. Tinsley, Sandy Job–Rivera, Christie Stubbert, Charles Vonderschmitt, John Doe, Jane Roe, Richard Roe, and Unknown Internal Revenue Service, Department of the Treasury, and Department of Justice Employees, Defendants.

No. 4:CV92–3029.

United States District Court, D. Nebraska.

Sept. 6, 1995.

Robert B. Creager, Amie Martinez, Anderson, Creager & Wittstruck P.C., Lincoln, NE, for plaintiffs.

Michael J. Salem, Gerald A. Role, Trial Attorneys, Tax Division, U.S. Department of Justice, Washington, DC, for defendants.

## MEMORANDUM AND ORDER, INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

The bench trial now concluded, there remain only two issues for resolution regarding the question of liability:[1]

(1) Did a special agent of the Criminal Investigation Division of the Internal Revenue Service (IRS) violate the provisions of 26 U.S.C. § 6103 regarding restrictions on disclosure of "tax return information" and thereby render the United States liable to Plaintiffs under the provisions of 26 U.S.C. § 7431 by giving sensitive information to a confidential informant?

(2) Has the United States failed to return property belonging to Plaintiffs which was seized by the government pursuant to various search warrants, and, if so, should the government be required, under Fed. R.Crim.P. 41(e) or the equitable powers of this court, to return the property to Plaintiffs?

I find in favor of the United States on both remaining issues. As to the first issue, I find and conclude that the IRS agent violated the provisions of section 6103(a) when he disclosed information about the impending execution of a search warrant to a confidential informant. However, I also find and conclude, albeit reluctantly,[2] that the disclosure

---

1. The parties agreed that trial on the issue of damages would be bifurcated from trial on the issue of liability, and the magistrate judge so ordered. (Filing 127 ¶¶ E, O.)

2. As the United States Court of Appeals for the Eighth Circuit recognized in a similar case, "even without an actual conviction, the suggestion of criminal activity can transform and devastate an individual's life." *Diamond v. United States*, 944 F.2d 431, 434 (8th Cir.1991) (although disclosure violated section 6103, it was based upon a good-faith interpretation of section

6103). While the United States has now publicly stipulated that no criminal charges have been filed or are intended to be filed against any of the plaintiffs, it will be difficult, if not impossible, for these innocent taxpayers to erase the stigma which may well have been created, at least in part, by the disclosure. Because I believe the disclosure violated the law in that it was based upon an erroneous (but good-faith) interpretation of the pertinent statute, I am, as stated in the text, reluctant to decide that Plaintiffs are without a remedy under the law. However, Congress has made it clear that the United States shall

resulted from a good-faith, but erroneous, interpretation of section 6103. Therefore, the United States can have no liability to Plaintiffs. 26 U.S.C. § 7431(b). As to the second issue, I find and conclude that the United States has returned to Plaintiffs all the property seized.

Accordingly, pursuant to Federal Rule of Civil Procedure 52(a), I now issue the findings of fact and conclusions of law that have informed my decision.[3]

## I.

### A. Procedural History

This case has a complex procedural history. A brief description of that history will provide a meaningful context for the discussion to come.

When this case was assigned to United States District Judge Warren K. Urbom, he granted a motion to dismiss by private individuals named as defendants and dismissed Counts IV and VI. *See* Filing 22 (holding that wrongful-disclosure allegations of Count IV did not state a claim against private individuals and further holding that conspiracy allegations of Count VI did not state a claim). Among other things, the result of Judge Urbom's ruling was that none of the private defendants had liability on the wrongful-disclosure claim.

Thereafter, the case was assigned to me. I considered and granted in part and denied in part various defense motions. *See Jones v. United States,* 869 F.Supp. 747 (D.Neb. 1994) (*Jones I*) (granting motion to dismiss without prejudice to amendment regarding Count V and granting motion for summary judgment regarding Counts I, II, and III except for allegation that government wrongly disclosed to confidential informant that a search warrant was to be served at Plaintiffs' business premises); *Jones v. United States,* 878 F.Supp. 1290 (D.Neb.1995) (*Jones II*) (granting motion for summary judgment as to IRS agents sued in their individual capacities regarding the allegations of Count V and

holding that those agents had qualified immunity from suit for damages). The impact of the partial granting of these motions was to limit trial of this case to the two issues identified earlier.

Related cases have also generated two appeals to the United States Court of Appeals for the Eighth Circuit. One appeal dealt with the question of whether or not the identities of various confidential informants should be disclosed to Plaintiffs for use in this and related civil litigation. *United States v. Jones Oil Co.,* 60 F.3d 831, 1995 WL 408251 (8th Cir.1995) (affirming Judge Urbom's refusal to require the government to disclose the names of confidential informants and to produce unredacted search warrant affidavit for civil-litigation purposes). *See also Jones I,* 869 F.Supp. at 749–50 (adopting Judge Urbom's decision and holding that the government should not be compelled to disclose identities of confidential informants described but not named in search warrant affidavit).

In accordance with its pretrial position, *United States v. Jones Oil Co.,* 60 F.3d 831, 1995 WL 408251 (8th Cir.1995), *Jones I,* 869 F.Supp. at 749–50, the government objected at trial to any questions that might have disclosed the identities of confidential informants. Plaintiffs' counsel withdrew at trial any questions the government objected to on this basis.

The other appeal in a related case dealt with Judge Urbom's dismissal of two claims asserted against some or all of the defendants in this suit. *Jones v. United States,* 16 F.3d 979 (8th Cir.1994) (affirming Judge Urbom's dismissal of a complaint in a related case and holding that government enjoyed sovereign immunity with respect to taxpayers' claims under Federal Tort Claims Act and further holding that taxpayer failed to state a claim under 42 U.S.C. § 1983).

have no liability for an erroneous, but good-faith, interpretation of the law. It is my duty to enforce the will of Congress, despite the truly unfortunate consequences to Plaintiffs. Nevertheless, I hope this recognition of Plaintiffs' innocence will serve in some measure to ameliorate the harsh consequences of my opinion.

**3.** Any finding of fact that should be considered as a conclusion of law shall be so construed, and any conclusion of law that should be considered as a finding of fact shall be so construed.

## B. Facts

I find the following material facts to be true:

### Background

1. Plaintiffs Terry and Patricia Jones are married and reside in Lincoln, Nebraska. (Filing 127 ¶ D1.) Terry and Patricia Jones own or control all of the other plaintiffs, including Jones Oil Company, Inc. (Jones Oil). (*Id.* ¶ D2–3.)

2. Prior to February 1, 1990, the United States was advised by confidential informants that Jones Oil, its employees, and/or its president, Terry Jones, were violating federal law with respect to the collection and payment of motor fuel taxes. (*Id.* ¶ D5.)

3. On February 1, 1990, pursuant to various search warrants issued by the United States District Court for the District of Nebraska, the United States seized records and property at, among other places, the place of business of Jones Oil in Lincoln, Nebraska. (*Id.* ¶ D6.)

4. In June, 1994, and October, 1994, the United States returned to Plaintiffs all items of property seized pursuant to the search warrants except those items of property which the government reasonably retained for purposes of further criminal investigation or prosecution of other parties. (*Id.* ¶ D7.)

5. There is no pending criminal investigation of any of the plaintiffs with respect to the subject matter of the investigation at issue herein, and no criminal charges have been filed or are intended to be filed against any of the plaintiffs. (*Id.* ¶ D8.)

6. Jones Oil was believed by the IRS to be "a family business" which had "grown in fourteen years to a petroleum supplier" selling "a projected 30 million gallons of fuel in 1989," serving clients in "twenty-three states from as far east as Michigan and Indiana and as far west as Utah." (Ex. 3A p. 2 ¶ 4 (redacted search warrant aff.).)

### Initial Contact with Confidential Informants in 1989

7. Sometime, probably in 1989, two individuals who later became confidential informants for the Internal Revenue Service called the IRS in Omaha, Nebraska, with information about one or more of the plaintiffs and alleged irregularities with respect to motor fuel excise taxes. (Tr. 145:5–9.) Special Agent Angelo Stennis (Stennis) of the IRS Criminal Investigation Division in Omaha, Nebraska, had various conferences with these individuals, and sometime in 1989 the IRS designated these individuals as confidential informants, with Stennis in turn being designated as the agent who would primarily deal with these individuals. (Tr. 147:15–22.)

8. The informants received assurances of confidentiality from Stennis, and Stennis employed the standard IRS procedure for keeping the names of the individuals confidential within the IRS. (Tr. 147:15–20; 237:14–238:5; 238:18–240:6.) For example, only one other person within the IRS knew the identities of the informants, and that person served as a "backup" agent in case Stennis was not available. (Tr. 239:23–240:1–3.) Otherwise, the names of the informants were kept in a sealed envelope that could only be opened by the chief of the Criminal Investigation Division in case of an emergency. (Tr. 240:3–5.)

9. Initial contact between the IRS and these individuals was not prompted or induced by either the IRS or Stennis. (Tr. 140:13–144:23.)

10. Sometime after the initial contact by the confidential informants, IRS agents in Indiana contacted IRS agents in Nebraska asking for information about one or more of the plaintiffs and suspected irregularities with respect to motor fuel excise taxes. (Tr. 148:25–149:16.) Stennis provided IRS special agent Stephen L. Tinsley (Tinsley), an IRS Criminal Investigation Division agent in Indiana, with the names of the confidential informants who had called the IRS in Omaha earlier. (Tr. 150:1–13.)

11. Tinsley (and other IRS agents in Indiana) had begun to gather information about one or more of the plaintiffs and possible motor fuel excise tax irregularities, but IRS management had not authorized Tinsley to commence a "numbered" investigation of Plaintiffs. (Tr. 148:25–150:5.)

### "Information Gathering" Versus "Numbered Investigations"

12. For various purposes, including the disclosure of "tax return information," the

IRS has a policy of differentiating between "information gathering" and "investigation" (sometimes called "numbered investigation"). (Tr. 86:21–89:2.) In the "information-gathering" stage, IRS agents are limited by IRS policy as to how they may obtain information about a taxpayer. (Tr. 90:20–91:2.) While they are limited by this policy in many respects, the "information-gathering" stage does allow IRS agents to seek and execute search warrants and interview informants who contact the IRS. (*Id.*)

13. During the "information-gathering" stage, IRS agents are also limited by IRS policy as to how they obtain information from "third-party witnesses." (Tr. 87:22–88:1.) For example, during the "information-gathering" stage, IRS agents are generally prohibited from initiating contact with a private citizen who might be a witness[4] if that person has not first contacted the IRS. (*Id.*)

14. During the "information-gathering" stage, IRS agents may interview witnesses who first come to the IRS, but both Tinsley and Stennis believed that IRS policy generally prohibited agents from disclosing information to witnesses who had first contacted the IRS unless such disclosure was "necessary" to obtain further information. (Tr. 91:1–93:3; 146:19–147:7; 246:20–247:6.) In other words, it was general IRS policy that in the "information-gathering" stage IRS agents were allowed to receive information from persons who first contacted the IRS, but agents were not to give information to these witnesses unless such disclosure was "necessary" to obtain further information. (*Id.*)

15. No "numbered investigation" was commenced regarding Plaintiffs until after the execution of the warrants. (Tr. 87:15–17).[5]

### CIs Provide Wealth of Detail—December, 1989/January, 1990

16. Sometime in late fall, 1989, or early January, 1990, Tinsley arrived in Nebraska and began gathering information. (Tr. 94:4–19; 151:22–152:1.) Stennis introduced Tinsley to the confidential informants. (Tr. 151:2–18.) Together Tinsley and Stennis interviewed the confidential informants about the plaintiffs, with Tinsley estimating that the interviews may have spanned two days, (Tr. 94:7–14), and Stennis estimating that there were "three, four, five meetings." (Tr. 152:17–21.)

17. The confidential informants provided Tinsley and Stennis with a great deal of information about Plaintiffs and their business. We know the informants provided a great deal of information because Judge Urbom released a redacted portion of a search warrant affidavit to Plaintiffs on April 15, 1994. (Ex. 3A.) The unredacted portion of the heavily redacted search warrant affidavit, which identified the confidential informants by the designations "CI–1" or "CI–2" but not by name,[6] indicates the confidential informants had intimate knowledge about Plaintiffs and their business. Indeed, one confidential informant was described as having previously been employed by Jones Oil. (Ex. 3A p. 17 ¶ 25.)

18. The informants' knowledge included how the books were kept, the fact that the records were computerized, what sales methods were used, how federal and state excise taxes were collected and paid (or not paid), and the specific locations of books and records. (Ex. 3A pp. 10–20 ¶¶ 24–26.) One of the confidential informants also gave the IRS detailed drawings identifying the precise locations of computers, files, desks, and the like at the business premises of Jones Oil. (Ex. 3A p. 26 ¶ 37 & attached Exs. 1, 2.) Both informants generally accused Terry Jones and Jones Oil of maintaining suspicious books and accounting practices. (Ex. 3A pp. 15–16 ¶ 24, p. 17 ¶ 25.) One informant specifically accused Terry Jones of being aware of an "apparent failure to charge excise taxes on certain sales," (Ex. 3A p. 15 ¶ 24), and the other informant specifically accused Jones of instructing "his bookkeepers not to pay [excise taxes] to the appropriate taxing authority." (Ex. 3A p. 18 ¶ 25.) The search warrant affidavit disclosed time periods when certain specified activities took

---

**4.** The agents may, however, contact public sources to gather information.

**5.** I previously found that Terry Jones and Jones Oil were notified they were the subject of a criminal investigation on March 30, 1990. *Jones I,* 869 F.Supp. at 757 (finding 32).

**6.** Stennis testified there were never more than two informants. (Tr. 147:15–24.)

place at Jones Oil which were apparently witnessed by the informants or in which the informants participated. (Ex. 3A p. 10 ¶24, pp. 23–25 ¶29.)

19. Tinsley and Stennis had meetings with the confidential informants during the months of December, 1989, and January, 1990, "to discuss what they knew about Jones Oil Company." (Tr. 151:15–19.) During this time, no disclosure about a search warrant was made to the confidential informants, but according to Stennis, "some of the questions we asked of them would lead one to believe that we wanted to find records in Jones's offices." (Tr. 152:14–16.) Indeed, Stennis agreed there were "certain questions we would ask of them that would lead someone to believe that, yes, we are working towards a search warrant." (Tr. 246:1–3.) Although Stennis and Tinsley never expressly told the informants their "Jones Oil investigation involved federal taxes … that's the general area that we talked to them about throughout our interviews." (Tr. 243:1–6). In fact, Stennis has admitted that he had "no doubt in [his] mind" that the informants would have known that "we were investigating excise tax violations." (Tr. 154:12–18.)

### Warrant Issuance—Morning of 01/31/90

20. Even though Tinsley was from Indiana, by agreement between IRS management in Nebraska and Indiana, Tinsley was the designated "agent in charge" and the person generally responsible for the Jones Oil matter, which responsibility included obtaining and executing search warrants regarding the Jones Oil matter at the Jones Oil premises in Nebraska. (Tr. 129:23–24; 217:21–22; 218:1–6.)

21. On the morning of January 31, 1990, (Tr. 97:24–98:4), as the "agent in charge," Tinsley prepared and submitted to this court an application for search warrant regarding the business offices of Jones Oil and certain other locations associated with Jones Oil. (Ex. 3A (redacted aff.).)

22. Judge Urbom signed the requested search warrants at 11:11 a.m., January 31, 1990, and directed that the search be conducted on or before February 1, 1990. (Exs. 3B (warrant), 3C (warrant), 3D (warrant).)

23. It has been stipulated by the parties that the application for and issuance of the search warrants could not have been ascertained by the public from this court's records until after February 1, 1990. (Tr. 169:20–171:2.) Of course, there is no stipulation or evidence that this court would not have entertained and granted a motion to disclose all or a portion of the search warrant affidavit to counsel for Plaintiffs had a motion for return of property been filed on the day the search warrant was executed. See Fed.R.Crim.P. 41(e). Terry Jones became aware of the existence of the search warrants at about 7:30 a.m. on February 1, 1990. (Tr. 37:13–38:15.) Judge Urbom, who issued the warrants, later turned over the redacted search warrant affidavit to Plaintiffs' counsel on April 15, 1994. (Ex. 3A.)

### Stennis's Disclosure—Afternoon of 01/31/90

24. Tinsley decided that Stennis should not take part in the execution of the search warrants at Jones Oil because he had been part of an earlier investigation of the company. (Tr. 107:20–111:22.) Nevertheless, Stennis, the resident IRS agent in Lincoln, Nebraska, at the time, (Tr. 237:2–9), was aware that the warrants had been sought and obtained, and he knew the search warrants would be executed at 7:00 a.m. on February 1, 1990. (Tr. 107:20–108:17; 247:25–248:4; 257:6–8.)

25. On the afternoon of January 31, 1990, (Tr. 162:5–10), without first clearing the contact with Tinsley, (Tr. 129:10–17; 218:7–25), Stennis telephoned one of the confidential informants. (Tr. 161:18–162:1.) At trial, and at the government's insistence, Stennis refused to reveal the name of the person to whom he had made the disclosure.[7] What

---

7. In accordance with its pretrial position, *United States v. Jones Oil Co.*, 60 F.3d 831, 1995 WL 408251 (8th Cir.1995), *Jones I*, 869 F.Supp. at 749–50, the government objected at trial to any questions that might have disclosed the identities of the informants. (Tr. 157:7–158:12.) Specifically, the government objected to the following question addressed to Agent Stennis: "At any-

time prior to February 1st, 1990, Agent Stennis, did you have any conversations with Ricardo A. Lucchino, also known as Rick Lucchino, that concerned the subject matter of the service of a warrant or the existence of a warrant to be served on Jones Oil Company?" (Tr. 157:7–11.) The government argued that by process of elimination this type of question, although not

Stennis told the informant is in dispute. Stennis and Tinsley each have a different version of what Stennis told the informant.

26. According to Stennis, he "asked that informant to be cautious over the next several days, and if there was [*sic*] any problems that occurred or anything that that informant perceived as a threat from anyone at Jones Oil, to let me know." (Tr. 161:18–162:1; 242:2–7.)

27. Tinsley's version was different. On February 2, 1990, Tinsley had a conversation with Stennis. (Tr. 110:1–111:3.) Stennis "was asking how things had gone" relative to execution of the search warrant inasmuch as Stennis had not been part of the search warrant team. (Tr. 111:1–16.) Tinsley testified [8] that during this conversation Stennis told him "a confidential informant had been advised that a search warrant was going to be executed." (Ex. 2 at 95:2–6.)

28. Whatever the actual disclosure was, it "upset" Tinsley. (Tr. 222:11.) While Tinsley did not feel the disclosure violated relevant IRS disclosure principles because he believed that IRS agents had the right to make a disclosure when "in the opinion of the agent, it's necessary" with regard to the informant's "safety" or "well being," (Tr. 112:15–18; 126:18–129:8), the disclosure nevertheless troubled Tinsley for two reasons.

29. First, as a matter of principle, Tinsley believed that as the "agent in charge" he should have been notified of any concern regarding informant safety and the like because if anything went wrong, he would be held responsible without first having had the opportunity to take precautions, such as placing the informant in a "safe house." (Tr. 220:19–221:19; 222:6–14.)

30. Second, because Tinsley and Stennis had met with the confidential informants personally and Stennis had not expressed "any

concern for the safety of the confidential informants," (Tr. 218:16–19), Tinsley was "surprised." (Tr. 218:12–15.) Because of their personal dealings with the informants, Tinsley expected that Stennis would advise him of such concerns. (Tr. 222:6–14.) Simply put, Tinsley did not like "surprises" about informants with whom he had dealt. (Tr. 218:20–23; 222:6–14.)

**What Stennis and Tinsley Thought About the Legality of the Disclosure**

31. Stennis had two related reasons for disclosing information to the informant. (Tr. 256:18–258:18.)

32. First, Stennis testified that he was concerned about the "safety" and "well being" of the confidential informants. Stennis himself "had had a number of run-ins with Terry Jones...." (Tr. 164:4–5.) And "at least one [informant] mentioned to me that that informant believed that if Jones ever found out about this investigation, there could be some adverse action that could be taken against that informant." (Tr. 164:5–9.) Indeed, Stennis "knew that there were a number of things that have happened in the past with regard to my informants in which they crossed paths with Mr. Jones, and they had some ugly things happen to them as a result...." (Tr. 257:8–12.) Although the informants were not on the Jones Oil premises when the search warrants were executed, "[t]hey were fairly close to that general area." (Tr. 162:23–163:9.) As a consequence, Stennis was concerned that once the warrants were served, the "investigation" would become "public knowledge," (Tr. 256:13), and "[t]his is a time that, yes, I want to know about anything that may happen with my informant." (Tr. 256:14–15.)

33. Secondly, Stennis in effect viewed the informants as a particularly valuable re-

---

phrased so as to relate to the status of Lucchino as a confidential informant, could be used to indirectly establish who was a confidential informant. Without conceding the validity of the government's objection, Plaintiffs' counsel withdrew the question after I indicated I might direct the witness to answer, but, if I did, the government might also be permitted to seek an interlocutory appeal. (Tr. 160:19–161:15.) No similar questions were propounded by Plaintiffs' counsel to any witness.

8. This testimony was given both at trial, (Tr. 112:23–115:4), and by deposition. (Ex. 2.) For purposes of the deposition, Tinsley was designated as the government's official representative pursuant to Fed.R.Civ.P. 30(b)(6), and the government concedes that he was authorized to make admissions on behalf of the United States. (Tr. 168:4–9.) The deposition testimony was received in evidence as an admission by the government. (Tr. 168:13–169:17.)

source to the government. Because no "numbered investigation" had yet been authorized, Stennis was limited by IRS policy, as discussed earlier, as to how he could acquire information about Jones Oil and other oil companies. (Tr. 243:17–24.) Consequently, the informants were particularly valuable to Stennis and the IRS because, except for these individuals who had first contacted the IRS, Stennis was not permitted to initiate third-party witness interviews, and Stennis had a "realistic expectation of obtaining further information" from the informants, not only about Jones Oil but also other oil companies, after the search warrants were executed. (Tr. 242:8–12; 243:7–24; 257:14–15.) Thus Stennis had:

> a real concern that if something happened to my informant, whether it's some bodily injury or perhaps a lawsuit or what-have-you, I have a very good source that was gone, so ... if something does happen to this guy in the next few days, I want to know about it immediately so we can take whatever actions were appropriate....

(Tr. 257:16–22.)

34. Both Tinsley and Stennis testified that they believed the informants continued to provide information to the IRS after the search warrant was executed. (Tr. 125:2–8; 240:19–24.)

35. Tinsley specifically testified that "[w]e routinely tell confidential informants various aspects [about investigations], one of which could be a search warrant if it's going to affect their safety or have concerns about their well being." (Tr. 127:18–128:3.) Tinsley testified that because the informants reported to Stennis, it was Stennis's "determination to make whether [a disclosure] was necessary." (Tr. 127:1–6.) This was true despite the fact that Tinsley was the agent in charge because Stennis "had been involved with these individuals for several months, and he knew them a lot better than I did...." (Tr. 130:9–12.) Although Tinsley would have preferred that Stennis inform him about the disclosure beforehand, had Stennis done so, Tinsley would have deferred to Stennis and would not have asked Stennis to elaborate as to the specific reasons why the disclosure was necessary. (Tr. 130:2–12.)

36. While neither Tinsley nor Stennis could give a specific citation to authority in the statutes, regulations, or IRS manuals that dealt with disclosures to confidential informants, both agents testified they thought Stennis's disclosure (whatever it might have been) was consistent with IRS disclosure policies they had been taught throughout their careers. (Tr. 116:1–18; 127:1–6; 213:18–215:3; 244:4–15; 245:1–3; 255:4–23; 256:18–257:25.) At the time of trial, Tinsley had been an IRS special agent for 15 years. (Tr. 213:18–23.) Stennis was also an experienced special agent, having received his initial training as an agent in 1980–81. (Tr. 244:4–7.)

37. Stennis was specifically asked if he considered on January 31, 1990, whether the disclosure he made was "lawful," and he replied that he "did not see a problem with it" because "I was concerned about my CI's welfare" and "I wanted to continue with that relationship." (Tr. 243:7–12.)

38. Although Stennis denied disclosing the existence of the search warrants or the fact that the search warrants were going to be executed, in answer to my questioning, Stennis stated that on January 31, 1990, he believed that the "statute" did not prohibit disclosure of the warrants or the impending execution of the warrants because such a disclosure to an informant would have been appropriate to obtain further information from that informant. (Tr. 256:18–257:25.) However, Stennis also testified that he had not considered whether, had the need to obtain further information not existed, the disclosure of the existence of the search warrants or the impending execution of the search warrants would have constituted a prohibited disclosure of "return information." (Tr. 258:1–21.)

39. Stennis further testified that he had received specific training from the IRS regarding the "types of things that you're allowed to discuss or not discuss with various individuals as you're working through an investigation." (Tr. 244:13–16.)

40. Stennis also testified, (Tr. 252:19–21), that he had read the provisions of 26 U.S.C. § 6103 and was aware that the general rule is "that information can't be disclosed unless there is an authorization or a provision that permits it." (Tr. 253:7–11.) Although he

stated he was unaware of any particular provision of section 6103 that specifically dealt with informants, (Tr. 255:4–11), Stennis was aware of "numerous exceptions to Section 6103 that may authorize [a] disclosure under certain circumstances." (Tr. 253:2–6.) And while Stennis could not "cite the specific provision that allows investigative disclosures," (Tr. 255:22), in February of 1990 Stennis was "familiar with the general provisions of 6103 with respect to the disclosure of information by revenue officers for investigative purposes." (Tr. 255:12–17.)

41. Plaintiffs concede that "Agent Stennis wasn't motivated by malice." (Tr. 265:17–18.)

**Planning for and Execution of Search—
01/31/90 and 02/01/90**

42. On the afternoon of January 31, 1990, and the morning of February 1, 1990, "pre-raid" meetings to plan the execution of the search warrants were held with various law enforcement agencies, including both state and federal officers. (Tr. 98:15–100:9; 123:9–19.) All those present at the meetings were told not to disclose either that there was an investigation or that search warrants were to be served. (*Id.*) Those present were also told that if the press showed up, all inquiries were to be referred to an Assistant United States Attorney, (Tr. 103:1–25), and, indeed, a video tape of a news account made on February 1, 1990, reflects one agent making that reference. (Ex. 1.) The video tape also reflects that the United States Attorney's Office was contacted by the press and refused comment. (*Id.*)

43. Although Stennis made the physical arrangements, such as securing the location for the briefings, he did not participate in any of the pre-raid briefings. (Tr. 99:12–13; 107:20–108:17.)

44. The warrants were executed at 7:00 a.m. on February 1, 1990. (Tr. 101:4–9; 102:4–15.) Approximately thirty-five IRS agents participated in the execution of the warrants. (Tr. 99:3–11; 123:9–14.) The agents were accompanied by two marked "squad" cars containing two uniformed local law enforcement officers. (Tr. 124:13–24.) These squad cars were parked in front of the buildings. (Tr. 124:25–125:1.) The agents wore "raid jackets" with letters that indicated they were either an "IRS" or "U.S. Treasury Special Agent." (Tr. 123:20–124:2.) The IRS agents brought with them a large truck to carry away the items they intended to seize. (Tr. 124:10–12.) The truck appears on the video-taped news account of the search. (Ex. 1.)

45. The search continued for approximately 12 hours after its beginning at 7:00 a.m. (Tr. 102:11–21.)

46. Stennis did not participate in the execution of the search warrants. (Tr. 156:8–15.)

47. Voluminous records and certain computer equipment were seized, but the Jones Oil computer system was operable when the IRS left the premises on February 1, 1990. (Tr. 215:4–216:12.)

**Sims Receives Call "Shortly
After" 7:00 a.m., 02/01/90**

48. John Sims (Sims) bought a car business from Terry Jones and operated that business from an office adjacent to the offices of Jones Oil. (Tr. 54:13–55:15.)

49. Sims was well acquainted with Ricardo A. Lucchino, Jr. (R. Lucchino) because Sims's sister was married to R. Lucchino and R. Lucchino was Sims's best friend. (Tr. 55:17–22.)

50. Sims also knew Steve Lucchino (S. Lucchino), R. Lucchino's brother. (Tr. 55:25–56:3.)

51. As will be seen later, R. Lucchino worked for Jones Oil at one time and was suspected by Plaintiffs of being one of the two confidential informants. R. Lucchino was working for a competitor of Jones Oil at the time of the search. As will also be seen later, S. Lucchino was an insurance agent who sold insurance to Jones Oil until R. Lucchino left Jones Oil, whereupon Terry Jones terminated the insurance business with S. Lucchino.

52. "Shortly after" 7:00 a.m., but no later than 7:35 a.m., on February 1, 1990, Sims received a phone call at his home from a person he believed to be S. Lucchino. (Tr. 57:1–14.) The conversation was "very quick," and the caller told Sims he "was

going to miss the fun [that] was going on at Jones Oil. Get to work." (Tr. 57:16–24.)

53. Sims went to work between 9:00 a.m. and 9:30 a.m. and found a "large moving van and a lot of people running around" at Jones Oil. (Tr. 58:15–24.)

### TV Reporter Arrives About 9:15 a.m.—9:30 a.m., 02/01/90

54. Michael McKnight was and is an "investigative reporter" and the Lincoln, Nebraska, bureau chief of a television station. (Tr. 21:21–22:1.) At the time of trial, McKnight had been employed by the station for 18 years. (Tr. 21:23–24.)

55. McKnight was responsible for general news and a special segment called "cover story." (Tr. 21:25–22:12.) As part of the "cover story," the television station ran commercials seeking to "generate tips" about news events. (Tr. 22:13–16.)

56. McKnight arrived at his office in Lincoln, Nebraska, around 9:00 a.m. on February 1, 1990. (Tr. 23:22–25.) He found a message on his answering machine leaving "a general tip that something was going on." (Tr. 24:1–4.) The answering machine did not indicate what time the message was left. (Tr. 24:5–7.) McKnight believed the voice on the recording was a male voice. (Tr. 24:16–17.)

57. Reacting to this tip, McKnight left his office and drove to the business premises of Jones Oil. (Tr. 24:18–23.) Armed with a television camera, (Tr. 24:24–25), McKnight arrived at the Jones Oil premises between 9:15 a.m. and 9:30 a.m. (Tr. 27:2–8.) He filmed the activity at the scene, including IRS agents carrying boxes from the Jones Oil premises and putting them into the truck. (Ex. 1.) The video tape does not indicate, (Ex. 1), and there is no evidence, (Tr. 216:18–217:12), that McKnight was allowed into the Jones Oil premises. However, some of the video tape shows IRS agents and Terry Jones in the premises. (Ex. 1.) It appears from the tape that this footage was shot from outside the buildings. (Ex. 1.)

58. That evening, the television station that employed McKnight ran McKnight's video tape, complete with his narration of his investigation into the activities of the IRS agents, on the evening news. (Ex. 1.)

59. Neither the video tape itself, nor McKnight's narrative, reflects any comments by the IRS agents or the United States Attorney's office. (Ex. 1.) Rather, the video tape records an IRS agent declining comment and referring questions to the United States Attorney's office. (*Id.*) McKnight's narration indicates the United States Attorney's office was contacted but declined to comment. (*Id.*)

### R. Lucchino Calls Sims Mid–Morning, 02/01/90, "Gloating"

60. In the "[m]id morning, later mid morning" of February 1, 1990, Sims received a telephone call from R. Lucchino, and R. Lucchino was "gloating." (Tr. 59:5–25.)

61. Sims interpreted R. Lucchino's "gloating" to mean Lucchino "was happy what was happening." (Tr. 60:1–9.)

### R. Lucchino Calls Again, Afternoon 02/01/90

62. During the afternoon of February 1, 1990, R. Lucchino called Sims again. (Tr. 60:21–25.)

63. R. Lucchino wanted to know "if things had calmed down … if there was a news crew there, still there...." (Tr. 61:9–16.)

### Sims Tapes Call with R. Lucchino, Late Afternoon 02/01/90

64. Sims called R. Lucchino later in the afternoon of February 1, 1990, and taped part of the call. (Tr. 61:22–62:7.)

65. Sims probably called R. Lucchino at the offices of Rock Port Oil. (Tr. 62:12–24.) As will be seen later, R. Lucchino worked for Rock Port Oil, a competitor of Jones Oil. Rock Port Oil had offices in Lincoln, Nebraska.

66. The taped part of the conversation was very short—15 to 30 seconds—because the machine "beeped" and this alarmed Sims, causing Sims to turn the recorder off. (Tr. 63:4–8.)

67. According to Sims, during the taped portion of the call, R. Lucchino "just basically took credit for the actions that had happened that morning … talking about how he or his people … notified the media to come down with their cameras...." (Tr. 63:15–64:9.)

68. Later that day Sims played a portion of the tape for Terry Jones. (Tr. 65:4–24.)

69. Terry Jones testified that he listened to the tape and remembered that R. Lucchino "was divulging the fact that the IRS was there, and that he took full credit for them being there and the investigation." (Tr. 46:17–22.)

70. According to Jones, R. Lucchino also "took full credit for the press being there, [he] was elated." (Tr. 46:22–23.)

71. Sims took the tape home that night, and when he told his wife he had taped his conversation with R. Lucchino, she destroyed the tape because she disapproved of her husband's recording the conversation. (Tr. 66:20–67:8.)

72. Sims further testified that R. Lucchino spoke with him three to 10 days prior to February 1, 1990, and cryptically told him "that there was something in the works with ... Terry or ... Jones Oil ... something was going to happen." (Tr. 67:25–68:13.)

### History of "Bad Blood"—R. Lucchino, et al. v. Jones

73. R. Lucchino and Gary Ernst (Ernst) previously worked for Jones Oil, as salesperson and part-owner respectively, but both left Jones Oil on less than amicable terms prior to the IRS "information-gathering" effort and the execution of the search warrants in this case. (Tr. 32:14–34:1.)

74. Rock Port Oil, a competitor of Jones Oil, opened offices in Lincoln, Nebraska, in the fall of 1987, at which time Rock Port hired R. Lucchino, Ernst, Trish Griggs (Griggs), who was the top salesperson for Jones Oil, and other employees of Jones Oil. (Tr. 34:8–35:22; 37:2–12.)

75. Jones Oil filed a "fairly contentious lawsuit" against Rock Port Oil in the winter of 1987–88 because R. Lucchino had allegedly taken proprietary information from Jones Oil and given it to Rock Port and "also [because he] took our top sales person, Trish Griggs." (Tr. 35:23–37:1.)

76. After the search warrants were executed, Terry Jones hired a private investigator "to visit with ... Rick Lucchino and Rock Port Oil, the employees, and try to ascertain what had happened here." (Tr. 200:3–201:8.) Jones admitted that the private investigator

lied to R. Lucchino, and Jones further admitted that he might have suggested the investigator lie. (Tr. 210:10–212:21.) As stated in Jones's deposition, which testimony Jones adopted at trial: "I sent a private detective over there to talk to Mr. Lucchino. He went purporting to be investigating me, not Mr. Lucchino, so Mr. Lucchino became suddenly an ally." (Tr. 210:10–25.)

77. S. Lucchino previously sold insurance to Jones Oil, but the "minute" Terry Jones found out that "his brother was in competition with me," the business relationship with S. Lucchino was terminated. (Tr. 51:19–52:1.)

### R. Lucchino's Deposition Testimony

78. Plaintiffs and the government both tried to subpoena R. Lucchino for trial, but they were unsuccessful in serving him. (Tr. 132:21–133:4.) Accordingly, his deposition was received in evidence. (Tr. 131:17–132:19; 234:16–235:15.)

79. Although he indicated he spoke with "federal people" at some time, (Ex. 101, 5:14–23), and further testified that he thought he might have talked to Tinsley and Stennis prior to February 1, 1990, (Ex. 101, 6:3–7:15), R. Lucchino generally professed difficulty remembering anything. (Ex. 101, 4:1–9:13.) Indeed, at one point R. Lucchino testified that he could not remember whether he once remembered an event and lamented that "I don't remember what I did yesterday." (Ex. 101, 9:13.)

80. R. Lucchino did, however, specifically deny he was told prior to February 1, 1990, that "the Internal Revenue Service or the Department of Treasury intended to go seize records of Jones Oil Company." (Ex. 101, 16:11–17.)

### Return of Seized Items

81. Tinsley testified that all items seized by the IRS on February 1, 1990, have now been returned to Plaintiffs. (Tr. 216:10–17; 219:16–220:15.)

82. Terry Jones was not able to articulate any specific item of property that had not been returned. (Tr. 196:4–197:21.)

### II.

I shall next apply the law to the facts of Plaintiffs' disclosure claim. I shall then sep-

arately apply the law to the facts of Plaintiffs' property claim.

## A. Disclosure Claim

### 1. General Rule of Section 6103(a)

Section 6103(a) of the Internal Revenue Code establishes a general rule that "returns" and "return information," as defined in the statute, shall be confidential. 26 U.S.C. § 6103(a) (Cum.Supp.1995). *See Church of Scientology of Cal. v. Internal Revenue Serv.,* 484 U.S. 9, 10, 108 S.Ct. 271, 271, 98 L.Ed.2d 228 (1987). The terms "returns" and "return information" are specifically defined in subsection (b) of section 6103.

Briefly summarized, "return information" is a very broad term of art that means:

(a) a taxpayer's identity, or

(b) the nature, source, or amount of the taxpayer's income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, tax deficiencies, overassessments, or tax payments, or

(c) whether the taxpayer's return was, is being, or will be examined or subject to other investigation, or

(d) any other data received by, recorded by, prepared by, furnished to, or collected by the Secretary of the Treasury with respect to tax returns or determination of the existence or possible existence of liability for any tax, penalty, interest, fine, or forfeiture. 26 U.S.C. § 6103(b)(2)(A).

Section 6103 establishes the anti-disclosure scheme that protects "returns" and "return information," but Title 26 U.S.C. § 7431 provides the civil remedy. Under section 7431, an officer or employee of the United States may render the United States liable if that officer "knowingly, or by reason of negligence, discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103." 26 U.S.C. § 7431 (1989). *See, e.g., Fostvedt v. United States,* 824 F.Supp. 978, 982–83 (D.Colo. 1993), *aff'd,* 16 F.3d 416 (1994) (tbl.).

### 2. Exception to General Rule— Section 6103(k)(6)

There are numerous exceptions to the general rule that an IRS agent may not disclose "returns" or "return information." *See, e.g.,* 26 U.S.C. § 6103(c)–(o). In this case, the United States relies upon the exception found at section 6103(k)(6).[9] (Tr. 259:13–260:1.)

Section 6103(k)(6) and the relevant implementing regulation, 26 C.F.R. § 301.6103(k)(6)–1,[10] provide for a disclosure of "return information" for "investigative purposes" when three requirements are met:

(a) The information sought by the IRS is "with respect to the correct determination of tax, liability for tax, or the amount to be collected or with respect to the enforcement of any other provision of [the Internal Revenue Code]";

(b) The information sought by the IRS is "not otherwise reasonably available"; and

(c) It is necessary to make the disclosure in order to obtain the additional information sought.

*Fostvedt,* 824 F.Supp. at 983 (citing *DiAndre v. United States,* 968 F.2d 1049, 1052 (10th Cir.1992), *cert. denied sub nom. Metro Denver Maintenance Cleaning, Inc. v. United States,* —— U.S. ——, 113 S.Ct. 1843, 123 L.Ed.2d 468 (1993)).

With regard to the question of whether it is necessary to make the disclosure:

[T]he Internal Revenue Code rules that disclosure be limited to the extent necessary to obtain information, as prescribed

---

9. That section provides:

(6) **Disclosure by internal revenue officers and employees for investigative purposes.**—An internal revenue officer or employee may, in connection with his official duties relating to any audit, collection activity, or civil or criminal tax investigation or any other offense under the internal revenue laws, disclose return information to the extent that such disclosure is necessary in obtaining information, which is not otherwise reasonably available, with respect to the correct determination of tax, liability for tax, or the amount to be collected or with respect to the enforcement of any other provision of this title. Such disclosures shall be made only in such situations and under such conditions as the Secretary may prescribe by regulation.

10. These regulations were first published in the Federal Register on October 3, 1980. 26 C.F.R. § 301.6103(k)(6)–1, at 43 (1994) (45 Fed.Reg. 65,569 (1980)).

by the Secretary of Treasury. *See* 26 U.S.C. § 6103(k)(6) (1988). The regulations issued by the Secretary provide for disclosure *only* when the necessary information cannot otherwise be reasonably obtained. *See* 26 C.F.R. § 301.6103(k)(6)–1 (1991).

*Diamond v. United States*, 944 F.2d 431, 436 (8th Cir.1991) (emphasis added).[11]

### 3. Elements of a Disclosure Cause of Action Under § 7431

In order to recover under section 7431, a taxpayer must prove at least three, and in this case four, elements by the preponderance of the evidence.

█ The first three elements are:

(1) The disclosure by the officer or employee was not authorized by the taxpayer or by some statute other than section 6103;[12]

(2) The disclosure was made "knowingly or by reason of negligence"; and

(3) The disclosure was in violation of section 6103. *Fostvedt*, 824 F.Supp. at 983; *Flippo v. United States*, 670 F.Supp. 638, 641 (W.D.N.C.1987), *aff'd per curiam*, 849 F.2d 604 (4th Cir.1988).

█ In addition, where the facts warrant it, as is the case here, a plaintiff may need to prove a fourth element, the element of "bad faith." This is because "[n]o liability shall arise under this section with respect to any disclosure which results from a good faith, but erroneous, interpretation of section 6103." 26 U.S.C. § 7431(b). *See, e.g., Fostvedt*, 824 F.Supp. at 983 (stating "the United States has absolutely no liability for good

faith but erroneous interpretations of section 6103. 26 U.S.C.A. § 7431(b)").

█ This statutory "good-faith" exception protects the United States from liability where the alleged violation arises from a good-faith misunderstanding of section 6103. Accordingly, plaintiffs who seek to recover under section 7431 must plead and prove "bad faith" if the facts raise the issue that the disclosure was based upon a misunderstanding of the statute. *Fostvedt*, 824 F.Supp. at 984–85.

The burden of proof is imposed on the plaintiff because the "good-faith" exemption from liability is not phrased as a defense in the statute, but rather as an element of the cause of action: *"No liability shall arise under this section with respect to any disclosure which results from a good faith, but erroneous, interpretation of section 6103."* 26 U.S.C. § 7431(b) (emphasis added). This "affirmative statement by Congress"—"no liability shall arise"—"makes bad faith an element of a [section 7431] cause of action." *Davidson v. Brady*, 732 F.2d 552, 553 (6th Cir.1984) (interpreting predecessor statute).

█ However, as section 7431(b) plainly states, "good faith" is limited to an "erroneous[ ] interpretation of section 6103." 26 U.S.C. § 7431(b). Thus, in order to prove the fourth element, a plaintiff must prove by the preponderance of the evidence either that:

(a) as a matter of fact, the disclosure decision was not based upon an interpretation of section 6103.[13] *See, e.g., Husby v. United States*, 672 F.Supp. 442, 445 (N.D.Cal.1987)

---

11. Title 26 C.F.R. § 301.6103(k)(6)–1(a) & (b), at 41–42 (1994) explicitly provides that "[d]isclosure ... should be made, however, *only* if [the] necessary information cannot, under the facts and circumstances of the particular case, otherwise reasonably be obtained...." (Emphasis added.)

12. For example, IRS agents are authorized to file notice of tax liens under some circumstances. *Compare* 26 U.S.C. § 6323(a) & (f) *with* 26 U.S.C. § 6103(k)(3).

13. However, neither the language nor the structure of section 7431(b) requires an IRS agent to be able to cite or quote section 6103 in order for the agent's disclosure decision to be predicated upon a "good-faith" interpretation of section 6103. Rather, the question is whether the agent

interpreted the statute and, if so, whether the agent's interpretation was objectively plausible. As long as the agent is aware of the principles of section 6103 at the time the disclosure decision is made, and the agent acts in whole or in part because of his or her interpretation of those principles, the agent is *in fact* interpreting the statute even though he or she may not be able to cite or quote the statute.

Plaintiffs' candid and able counsel agreed that an agent would not be required to be able to cite or quote the statute in order to claim entitlement to the "good-faith" exception so long as the agent was *in fact* endeavoring to apply the principles of the statute at the time the disclosure decision was made.

At oral argument I observed,

(section 7431(b) applies only to good-faith misinterpretations of section 6103; here defendant failed to explain who, if anyone, made such an interpretation or what the erroneous interpretation might have been, therefore, good-faith defense not available); or

(b) if the disclosure decision was predicated upon an interpretation of section 6103 as a matter of fact, the disclosure, objectively tested,[14] nevertheless violated a clearly established right under section 6103 about which a reasonable IRS agent would have known. *See, e.g., Diamond v. United States,* 944 F.2d at 435–36 (IRS agent's use of identification block on letter to third party stating that the agent was with the Criminal Investigation Division was not authorized by section 6103(k)(6) because the disclosure was unnecessary and therefore improper under 6103, but disclosure was not made in bad faith because agent followed the IRS manual and IRS cautioned agents against unnecessary disclosures.).

With regard to whether the disclosure violated a clearly established right under section 6103, the United States Court of Appeals applied the analytical method employed in general "qualified-immunity" cases. *Diamond,* 944 F.2d at 435–36 (quoting *Rorex v. Traynor,* 771 F.2d 383, 387 (8th Cir.1985)) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). *See also Rorex v. Traynor,* 771 F.2d 383, 387 (8th Cir.1985) (applying predecessor statute, upholding district court's denial of motion for directed verdict on "good-faith-immunity" question, and affirming verdict in

favor of taxpayers where IRS agent served notice of levy even though taxpayers were meeting their obligation to the IRS pursuant to an agreement with IRS and the agreement provided that taxpayers would receive notice if their agreement was not approved by IRS).

In this case, because there is no claim by the government or evidence in the record that the IRS has a stated policy dealing specifically with disclosures of return information to confidential informants in these circumstances,[15] it is appropriate to focus on Agent Stennis's conduct. *Diamond,* 944 F.2d at 435 n. 7. Nevertheless, this inquiry is objective. *Id.* at 435.

■ The "relevant question" "is the objective (albeit fact-specific) question" of "whether a reasonable [special agent with the IRS] *could have believed* [the disclosure of return information] to be lawful, in light of clearly established law and the information [the IRS agent] possessed." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (emphasis added). Thus, in order for the United States to have liability to the plaintiffs for "bad-faith" disclosure of tax return information, "[t]he contours of the right must be sufficiently clear that a reasonable [IRS agent] would understand that what he is doing violates that right." *Id.* at 640, 107 S.Ct. at 3039. Stennis's "subjective beliefs" about his conduct "are irrelevant." *Id.* at 641, 107 S.Ct. at 3039.

### 4. Application of Elements of Cause of Action to the Facts

From the foregoing, I find and conclude that Plaintiffs in this case must prove the

---

I understand Agent Stennis to be articulating not in the language of the statute precisely but generally what (k)(6) seems to outline ... [and] it seems to me that he ought not to have to recite it to you verbatim or recite the section numbers to you in order to be able to rely on good faith if the elements of his reliance [are consistent with] either the statute or regulation....
(Tr. 271:7–16.)
Plaintiffs' counsel responded, "Judge, in all honesty, I don't disagree with that at all." (Tr. 271:17–19.) However, counsel was also quick to add that he did not believe as a matter of fact that Stennis was applying the principles of the statute. Rather, "[t]his is a lawyer's argument ... and we are trying to now figure out how we can get him within that." (Tr. 271:17–272:4.)

14. Indeed, the government conceded that "good faith" "is an objective standard" in this case. (Tr. 194:6–8.)

15. Note that 26 U.S.C. § 6103(i)(4)(C) provides that in certain circumstances, "[n]o return ... information shall be admitted into evidence ... if the Secretary determines and notifies the Attorney General ... that such admission would identify a confidential informant...." Likewise, the Secretary may withhold return information in certain circumstances where the disclosure would identify a confidential informant. 26 U.S.C. § 6103(i)(6). Neither side in this case suggests that these subsections have any particular relevance to the issues confronting the court.

following four elements by the preponderance of the evidence:

(1) Stennis's disclosure was not authorized by Terry Jones or Jones Oil or some statute other than section 6103; and

(2) Stennis's disclosure was made "knowingly or by reason of negligence"; and

(3) Stennis's disclosure was:

(a) generally prohibited by section 6103(a) in that it revealed "return information"; and

(b) specifically not exempted by section 6103(k)(6) because:

(i) the information sought by the IRS was not "with respect to the correct determination of tax, liability for tax, or the amount to be collected or with respect to the enforcement of any other provision of [the Internal Revenue Code]"; or

(ii) the information sought by the IRS was "otherwise reasonably available"; or

(iii) it was unnecessary to make the disclosure in order to obtain the additional information sought; and

(4) Stennis's disclosure was not based upon a "good-faith" misinterpretation of section 6103 because:

(a) as a matter of fact, the disclosure decision was not predicated upon an interpretation of section 6103 at the time of the disclosure; or

(b) if the disclosure decision was predicated upon an interpretation of section 6103 as a matter of fact, the disclosure, objectively tested, nevertheless violated a clearly established right under section 6103 about which a reasonable IRS agent would have known.

With the foregoing in mind, I shall now apply the facts of this case to the elements Plaintiffs must prove.

### First Element

#### Was Stennis's Disclosure "Authorized"?

There is no evidence, nor any claim by the government, that Terry Jones, Jones Oil, or any other plaintiff authorized the disclosure Stennis made. In fact, the evidence is to the contrary. Moreover, there is no evidence, nor any claim by the government, that some statute other than section 6103 authorized Stennis to disclose the information.

### Second Element

#### Was Stennis's Disclosure Made "Knowingly or By Reason of Negligence"?

■ It is clear that Stennis made his disclosure "knowing" he was disclosing sensitive information to the informant. It is also clear that Stennis intended to disclose the information to the informant and that he did not do so inadvertently.

Since Stennis's disclosure (whatever it was) was purposeful, and not mistaken, I find and conclude that the disclosure was "knowingly" made within the meaning of section 7431(a)(1).[16]

### Third Element

#### Was Stennis's Disclosure Generally Prohibited By Section 6103(a) In That It Revealed "Return Information"?

As noted earlier, "return information" is very broadly defined under 26 U.S.C.

---

**16.** The government does not argue that the word "knowingly" requires proof Stennis knew that his disclosure violated section 6103. Indeed, the common and ordinary meaning of the word "knowingly" is merely that the actor must be aware of what he or she is doing and does not act because of some mistake or accident. *See, e.g., Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit* § 7.03, at 406–07 (West 1994) (discussing meaning of "knowingly"). Awareness that the act is prohibited by law is not required for the actor to act "knowingly," as that word is commonly defined. *Id.*

Moreover, this interpretation of the word "knowingly" comports with the structure of 26 U.S.C. § 7431. Section 7431(c)(1)(B)(ii) provides for the imposition of punitive damages in

case of "willful disclosure" or disclosure as a result of "gross negligence." On the other hand, recovery of compensatory damages does not require such proof. 26 U.S.C. § 7431(c)(1)(A). Since punitive damages require proof that the disclosure was "willful" or by reason of "gross negligence," but compensatory damages do not, it is apparent that the word "knowingly" in section 7431(a)(1) does not require that the actor "know" the disclosure violates section 6103.

Accordingly, I find and conclude that the word "knowingly," as used in section 7431(a)(1), requires proof only that the actor was aware of what he or she was doing and that he or she intended to cause the act of disclosure. The word "knowingly" does not require that the actor "know" the disclosure violates section 6103.

§ 6103(b)(2). As a result, section 6103(a) generally prohibits disclosure of the fact that a taxpayer's "return ... is being ... examined or subject to other investigation or processing...." 26 U.S.C. § 6103(b)(2).

Furthermore, the United States Court of Appeals for the Eighth Circuit has interpreted the phrase "subject to other investigation or processing" very broadly in favor of the taxpayer. The court of appeals has held that this phrase prohibits disclosure of any information which reasonably tends to indicate that IRS criminal investigators are interested in a particular taxpayer. *Diamond,* 944 F.2d at 434 (Mere identifier "Criminal Investigation Division" on the signature line of a letter of inquiry seeking information about a patient's financial transactions with taxpayer doctor constituted disclosure of "return information" since it "clearly falls" within the meaning of the words "whether the taxpayer's return was, is being, or will be examined or subject to other investigation.").

With the understanding that "return information" is generally broadly defined by section 6103(b)(2) and that the portion of section 6103(b)(2) which uses the words "subject to other investigation or processing" has likewise been broadly applied by the court of appeals to protect taxpayers, I turn to a determination of whether Stennis's disclosure was generally prohibited by section 6103(a).

### What Was Disclosed?

As a factual matter, I must first determine the answer to the following question: What in fact did Stennis disclose to the confidential informant? This is not any easy question to answer.

Plaintiffs argue that Agent Tinsley's version is the correct one. Tinsley testified that during a conversation with Stennis one day after the execution of the search warrants, Stennis told him "a confidential informant had been advised that a search warrant was going to be executed." (Ex. 2, 95:2–6.)

In contrast, the government argues that I should adopt Stennis's version. According to Stennis, he merely "asked that informant to be cautious over the next several days, and if there was [*sic*] any problems that occurred or anything that that informant perceived as a threat from anyone at Jones Oil, to let me know." (Tr. 161:18–162:1; 242:2–7.)

The government also advances a "fallback" position in the event I do not adopt Stennis's version exclusively. The government argues that I could believe both Tinsley and Stennis. (Tr. 274:1–9.)

■ I am persuaded by the government's alternative argument. I believe that combining both versions into one best represents the truth of what actually happened. That is, I find and conclude that Stennis most probably told the informant both that "a search warrant was going to be executed" and also "to be cautious over the next several days, and if there was [*sic*] any problems that occurred or anything that that informant perceived as a threat from anyone at Jones Oil, to let [Stennis] know."

I arrive at this combined version for six reasons:

(1) Both Tinsley and Stennis were credible;

(2) The substantive differences in their testimony are not great;

(3) Given that Tinsley had responsibility for the search warrants and Stennis had responsibility for the informants in this case, it is not surprising that Tinsley remembers mention of the warrants while Stennis's memory focuses upon informant safety;

(4) From Stennis's point of view, the combined version of events is consistent with his concern for informant safety;

(5) S. Lucchino's telephone call to Sims in the early morning hours of February 1, 1990, and Sims's later phone conversations with R. Lucchino tend to prove that the combined version of events is the most accurate version; and

(6) To the extent he denied knowledge of the impending execution of the search warrants, R. Lucchino's testimony was not credible.

Initially, I found both Agent Tinsley and Agent Stennis to be credible. Both agents gave direct and responsive answers to the questions propounded by the court and counsel. Both men are experienced criminal investigators who obviously understand the full implications of violating the testimonial oath. Neither man faces personal liability for the

disclosure. *Diamond,* 944 F.2d at 435 ("Section 7431 actions must be brought against the government generally rather than against the agent individually."). Indeed, unlike Tinsley, who was a named defendant, Stennis was never made a party to this action. Honest people may, and frequently do, have different recollections of the same conversation. Thus, to the extent the differences in their memories can be reconciled, it makes sense to reconcile the versions of the two agents.

Next, the substantive differences between Tinsley's testimony and Stennis's testimony are not great. There is a fundamental similarity in both versions. Tinsley's version and Stennis's version are both based on one premise: Stennis made a disclosure that directly or indirectly communicated to an informant some impending action. In other words, both Tinsley and Stennis agree that a disclosure was made which suggested some impending action, and they disagree only on the precise language of that disclosure. It is not surprising that their memories differ as to precisely what was said, particularly given the passage of time between the February, 1990, phone conversation, the 1994 depositions, and the 1995 trial.

Moreover, unlike Stennis, who was not involved in obtaining or executing the search warrants, Tinsley had ample reason to remember precisely what Stennis said to him if in fact the conversation involved the search warrants and their execution. As the agent in charge, Tinsley was the person responsible for obtaining and executing the warrants. If there was a problem with the search warrants or their execution, Tinsley would be held accountable. Accordingly, since the disclosure "upset" and "surprised" Tinsley, Tinsley's recollection is likely to be more accurate than Stennis's memory with regard to execution of the warrants.

On the other hand, Stennis believed the informant already knew the IRS was seeking a search warrant because of the nature of the questions the agents had asked the informants earlier in the year. As Stennis stated at trial, "certain questions we would ask of them ... would lead someone to believe that, yes, we are working toward[ ] a search warrant." (Tr. 246:1–3.) In this same vein, while the handling of the warrants was left to Tinsley, the informants clearly remained the responsibility of Stennis. Indeed, Tinsley agreed that because the informants reported to Stennis, it was Stennis's "determination to make whether [a disclosure] was necessary." (Tr. 127:1–6.)

As a result, Stennis had no reason to remember precisely whether he told the informant about the execution of the search warrants since he was responsible for the informants, not the warrants, and since he believed the informant already knew the IRS was "working toward[ ] a search warrant." However, inasmuch as Stennis was responsible for the informants, his focus, and therefore his memory, was most likely on the issue of informant safety. It is therefore understandable that Tinsley remembered that portion of the conversation dealing with disclosure of the warrants, while Stennis remembered that portion of the conversation dealing with informant safety.

Likewise, even though Stennis does not recall such a disclosure, from his point of view it also makes sense to believe that Stennis disclosed the pendency of the execution of the search warrants to the informant so as to put in context his request to be cautious and to report any threats. This is particularly true because Stennis believed the informant already knew the IRS was seeking warrants. Stennis would therefore have had little practical reason not to divulge that the IRS had obtained what the informant already knew the agency was seeking.

In addition, I am impressed by the fact that Sims received a phone call from a person he believed to be S. Lucchino sometime between 7:00 a.m. and 7:35 a.m. on February 1, 1990. (Tr. 57:1–9.) The conversation was "very quick," and the caller told Sims he "was going to miss the fun [that] was going on at Jones Oil. Get to work." (Tr. 57:16–24.)

Sims had various telephone conversations with R. Lucchino throughout the rest of the day which revealed that R. Lucchino had knowledge about the IRS investigation and the attention the search warrant execution had drawn from the media. This conclusion is particularly evidenced by the one conversation which was recorded and later played for Terry Jones. According to Sims, R. Luc-

chino "took credit for the actions that had happened that morning ... talking about how he or his people ... notified the media to come down with their cameras...." (Tr. 63:15–64:9.)

Coming as it did within minutes after the IRS began executing the search warrants at 7:00 a.m., S. Lucchino's call corroborates Tinsley's testimony that Stennis told him an informant had advance notice that "a search warrant was going to be executed." The subsequent conversations Sims had with R. Lucchino further buttress this conclusion, especially R. Lucchino's reference to the fact that "his people" notified the media. If an informant were merely told to be cautious over the next few days and report threats, it is improbable that S. Lucchino would have become aware of the early morning activities of the IRS no more than 35 minutes after the IRS began executing the search warrants. It is equally doubtful that R. Lucchino's "people" could have been quickly assembled to call the media if an informant had not been given advance notice of the impending execution of the search warrants.

Finally, I recognize that R. Lucchino denied being told prior to February 1, 1990, that "the Internal Revenue Service or the Department of Treasury intended to go seize records of Jones Oil Company." (Ex. 101, 16:11–17.) In this regard, I also recognize that Terry Jones believes R. Lucchino and Ernst were the probable informants. (Tr. 208:8–209:5.) Nevertheless, I have completely discounted R. Lucchino's denial because the rest of his testimony was not credible.

Throughout his testimony, R. Lucchino professed virtually no memory of anything. For example, at one point R. Lucchino was asked: "As far as you know this memory is gone and buried and can't be retrieved. Do you want to answer that for me?" (Ex. 101, 9:18–22.) Lucchino lamely responded, "I don't remember." (Ex. 101, 9:21.) Thus, there is no reason to credit R. Lucchino's testimony on a crucial issue when he could not remember anything else of substance.

In summary, I find and conclude that it is appropriate to combine Tinsley's recollection with Stennis's recollection. As a result, I find and conclude that Stennis told an informant during the afternoon of January 31, 1990, that "a search warrant [is] going to be executed. Be cautious over the next several days, and if there [are] any problems that occur[ ] or anything that [you] perceive[ ] as a threat from anyone at Jones Oil, ... let [me] know."

### Was Stennis's Disclosure "Return Information"?

■ I find and conclude that Stennis's disclosure to the informant was in fact a disclosure of "return information" generally prohibited by section 6103(a). Stennis's disclosure notified the informant that a search warrant was going to be executed. Viewed in the context of the interviews the IRS agents had previously conducted with the informants, this disclosure amounted to notification that the tax returns of Terry Jones and Jones Oil were "subject to other investigation or processing," as defined by 26 U.S.C. § 6103(b)(2). *Diamond,* 944 F.2d at 434 (Mere identifier "Criminal Investigation Division" on the signature line of a letter of inquiry seeking information about a patient's financial transactions with taxpayer doctor constituted disclosure of "return information" since it "clearly falls" within the meaning of the words "whether the taxpayer's return was, is being, or will be examined or subject to other investigation.").

The government tries to avoid this conclusion by arguing that Stennis's disclosure did not specifically identify any taxpayer; thus even if the informant was told about a search warrant, there was no prohibited disclosure since no taxpayer was identified. Along this vein, the government adds that the IRS was "gathering information" about taxpayers other than Terry Jones and Jones Oil; thus an informant would not necessarily have known the search warrants were directed at Terry Jones and Jones Oil. I am not persuaded by this argument for two reasons.

First, although the "information-gathering" effort was not limited to Terry Jones or Jones Oil, I am persuaded that the primary thrust of the interviews with the confidential informants dealt with Jones Oil. Since an informant was the recipient of the disclosure, the identities of Terry Jones and Jones Oil as the taxpayers would have been apparent to the informant based upon prior meetings

with the IRS agents where Jones Oil was the focus. For example, it is undisputed that Tinsley and Stennis had meetings with the confidential informants during the months of December, 1989, and January, 1990, "to discuss what they *knew about Jones Oil Company.*" (Tr. 151:15–19 (emphasis added).)

More specifically, according to Stennis, "some of the questions we asked of them would lead one to believe that we wanted to *find records in Jones's offices.*" (Tr. 152:14–16 (emphasis added).) In this regard, the redacted search warrant affidavit establishes that the informants provided very specific details about the interior of the Jones Oil premises, including detailed drawings. (Ex. 3A p. 26 ¶ 37 & attached Exs. 1, 2.)

Moreover, while the informants were not on the Jones Oil premises when the search warrants were executed, "[t]hey were fairly close to that general area." (Tr. 162:23–163:9.) This proximity was obviously one of the reasons why Stennis made the disclosure in the first place.

When Stennis's disclosure is viewed in the context of the agents' dealings with the informants, the identities of the taxpayers who were "subject to investigation" would have been obvious whether or not they were explicitly identified by Stennis. The IRS defines a "disclosure" as the "making known of ... return information *in any manner. A disclosure may be either direct or indirect.*" *Internal Revenue Manual* pt. 9 Crim.Investigation, ch. 9700 Misc., sec. 9780 Crim.Investigation Div. Handbooks, subsec. 9781 Handbook for Special Agents, ch. 300 Gen.Investigative Procedure, sec. 340 Witnesses & Prospective Defs., subsec. 348 Disclosure, ¶ 348.2(4) (10–19–92) (available on Westlaw, Database FTX–IRM, citation IRM 9781 HB 348) (emphasis added) (hereinafter *Internal Revenue Manual*). Stennis's statements were an "indirect" disclosure as contemplated by the IRS, but still a "disclosure" nonetheless.

Second, even if the identities of the taxpayers were not obvious, Stennis explicitly tied the disclosure to Jones Oil. According to Stennis, he told the informant, among other things, that "if there was [*sic*] any problems that occurred or anything that that informant perceived as a threat from *anyone at Jones*

*Oil,* to let me know." (Tr. 161:18–162:1; 242:2–7 (emphasis added).) When this statement is added to the disclosure of the pendency of the execution of the search warrants and the other facts recited above, no reasonable person would believe the disclosure pertained to anyone other than Terry Jones and Jones Oil.

### Was the Disclosure Exempted By Section 6103(k)(6)?

As noted earlier, section 6103(k)(6) and the relevant implementing regulation, 26 C.F.R. § 301.6103(k)(6)–1, provide for a disclosure of "return information" for "investigative purposes" when three requirements are met. *Fostvedt,* 824 F.Supp. at 983 (citing *DiAndre v. United States,* 968 F.2d 1049, 1052 (10th Cir.1992), *cert. denied sub nom. Metro Denver Maintenance Cleaning, Inc. v. United States,* —— U.S. ——, 113 S.Ct. 1843, 123 L.Ed.2d 468 (1993)).

I find and conclude that two of the three requirements for "investigative" disclosure of "return information" in this case were satisfied under section 6103(k)(6). However, I am not persuaded that Stennis's disclosure was necessary. *See* 26 C.F.R. § 301.6103(k)(6)–1 (authorizing disclosures "*only* if [the] necessary information cannot, under the facts and circumstances of the particular case, otherwise reasonably be obtained ..." (emphasis added)); *Diamond,* 944 F.2d at 435 (finding that under 26 C.F.R. § 301.6103(k)(6)–1, the agent "did not need to [make the disclosure] to secure the desired information"). Since all three requirements must be satisfied for the exemption to apply, I also find and conclude that Stennis's disclosure was not exempted by section 6103(k)(6).

### First Requirement: "With Respect" to Internal Revenue Code

 As to the first requirement that the information sought was "with respect to the correct determination of tax, liability for tax, or the amount to be collected or with respect to the enforcement of any other provision of [the Internal Revenue Code]," it is clear that this requirement was satisfied. It is undisputed that the information Stennis sought by virtue of his disclosure was highly relevant "with respect to" both the correct determination of federal excise tax liability for Terry

Jones and Jones Oil and the enforcement of federal criminal laws respecting alleged evasion of such liability.

### Second Requirement: No Other Sources of Information Available

As to the second requirement that the information sought by the IRS was "not otherwise reasonably available," I am persuaded that this requirement was also satisfied.

It is obvious that because of the IRS policy on "information gathering," (*see* pt. IB ¶¶ 12–14), Stennis was severely restricted as to how he could obtain information from knowledgeable people about suspected illegal activities at Jones Oil.

If Stennis and the IRS were to have any human intelligence on the issue prior to the investigation being "numbered," the confidential informants were their only source of information. This very real resource problem existed because IRS policy, obviously designed in major part to protect the privacy of taxpayers, prohibited third-party contact with private individuals who had not first contacted the IRS.

Moreover, it is clear that Stennis believed these informants would be valuable to the IRS *after* the search warrants were served. As Stennis stated, he had a "realistic expectation of obtaining further information" from the informants, not only about Jones Oil but other oil companies, after the search warrants were executed. (Tr. 242:8–12; Tr. 243:7–24; 257:14–15.)

Finally, that Stennis's "expectation" was in fact "realistic" is confirmed by the evidence. It is obvious from the information revealed in the redacted search warrant affidavit that the informants, possessing as they did an intimate knowledge of Jones Oil's business, would be extremely valuable to the IRS *after* the execution of the search warrants for purposes of interpreting what was literally a truckload of documents seized by the IRS. In fact, both Tinsley and Stennis testified that they believed the informants continued to provide information to the IRS *after* the search warrants were executed. (Tr. 125:2–8; 240:19–24.)

■ In sum, the following three factors convinced me that the second requirement was satisfied:

(1) Stennis was limited by IRS policy as to whom he could contact, and the confidential informants became a very scarce resource as a result;

(2) Stennis believed the informants would provide further information after the search warrants were executed; and

(3) The informants had the ability to provide important help to the IRS in interpreting the Jones Oil records seized during the execution of the search warrants, and Tinsley and Stennis confirmed that the informants did in fact provide information to the IRS after the warrants were executed.

### Third Requirement: Disclosure "Necessary" to Get Information

As to the third requirement that it is necessary to make the disclosure in order to obtain the additional information sought, I cannot determine whether the disclosure complied with the Treasury regulation which implements the statutory policy, found in section 6103(k)(6), that authorizes "investigative disclosures." Under the Secretary's regulations, the United States is entitled to make an "investigative disclosure" of return information "*only* if [the] necessary information cannot, under *the facts and circumstances of the particular case,* otherwise reasonably be obtained." 26 C.F.R. § 301.6103(k)(6)–1 (emphasis added). *See Diamond,* 944 F.2d at 435.

■ Stennis's testimony leaves too many "gaps" for me to conclude that his disclosure was "necessary" as a matter of fact. In other words, Stennis did not specifically describe and explain, pursuant to the Secretary's regulation, why "the facts and circumstances of the particular case" necessitated the specific disclosure I have found that he made.[17]

---

17. In this regard, I note that because Tinsley and Stennis had met with the confidential informants personally and Stennis had not expressed "any concern for the safety of the confidential informants," (Tr. 218:16–19), Tinsley was "surprised." (Tr. 218:12–15.) Without some explanation from Stennis, I am reluctant to find as a matter of fact that the disclosure was "necessary" when Stennis never told Tinsley of his concern for informant safety.

Without an explanation of why the *specific* disclosure was "necessary," I lack a foundation upon which to compare the rationale for the disclosure against the facts and circumstances of this case. In other words, since I have neither Stennis's rationale for the *specific* disclosure nor his explanation of how his rationale fits the particular facts of this case, I cannot determine whether the disclosure was "necessary."

Of course, the reason Stennis did not "fill in the gaps" was that he did not remember making the specific disclosure about the pending execution of the search warrants. Hence, Stennis understandably could not explain why a disclosure he did not remember making was "necessary."

Be that as it may, because neither Stennis nor any other witness explained why it was in fact "necessary" to make the specific disclosure that I have found was made, I simply cannot determine whether the disclosure was actually "necessary." Because the United States is entitled to the exemption under section 6103(k)(6) only if all three requirements of the Secretary's regulation have been satisfied and I cannot determine whether the disclosure was "necessary," Plaintiffs have therefore established that the United States is not entitled to the exemption under section 6103(k)(6).

### Fourth Element

#### Was Disclosure Based Upon "Good–Faith" Misinterpretation of Section 6103?

■ As noted earlier, there are two questions that must be answered when determining whether the "good faith, but erroneous, interpretation" bar to liability under section 7431(b) applies. The first question to be answered is whether the disclosure decision was predicated as a matter of fact upon an interpretation of section 6103 at the time the disclosure was made.

Second, assuming the disclosure decision was predicated as a matter of fact upon an interpretation of section 6103, did the disclosure, objectively tested, violate a clearly established right under section 6103 about which a reasonable IRS agent would have known?

I shall answer these two questions next.

### Was Disclosure Decision Predicated As a Matter of Fact Upon An Interpretation of Section 6103 at Time of Disclosure?

■ I find and conclude that Stennis did as a matter of fact base his decision to make the disclosure to the confidential informant in significant part in reliance upon his understanding of section 6103. I arrived at this conclusion for four reasons.

First, Stennis had read section 6103. (Tr. 252:19–21.)

Second, while Stennis could not "cite the specific provision that allows investigative disclosures," (Tr. 255:22), in February of 1990 Stennis was "familiar with the general provisions of 6103 with respect to the disclosure of information by revenue officers for investigative purposes." (Tr. 255:12–17.)

Third, Stennis did in fact consider whether his disclosure was permitted at the time he made it. Stennis was specifically asked if he considered on January 31, 1990, whether the disclosure he made was "lawful," and he replied that he "did not see a problem with it" because "I was concerned about my CI's welfare" and "I wanted to continue with that relationship." (Tr. 243:7–12.)

Fourth, agents of the Criminal Investigation Division, including Stennis, repeatedly receive "disclosure" training from the IRS. For example, while neither Tinsley nor Stennis could give a specific citation to authority in the statutes, regulations, or IRS manuals that dealt with disclosures to confidential informants, both agents testified they thought Stennis's disclosure was consistent with IRS disclosure policies they had been taught throughout their careers. (Tr. 116:1–18; 127:1–6; 213:18–215:3; 244:4–15; 245:1–3; 255:4–23; 256:18–257:25.) Indeed, Stennis further testified that he had received specific training from the IRS regarding the "types of things that you're allowed to discuss or not discuss with various individuals as you're working through an investigation." (Tr. 244:13–16.)

While Stennis may not have had in mind the exact number or precise language of section 6103(k)(6) at the time he made his disclosure decision, I am satisfied that the principles of section 6103(k)(6) guided and

motivated Stennis's decision. As a result, I find and conclude that Stennis's disclosure decision was predicated as a matter of fact upon an interpretation of section 6103(k)(6).

**Assuming Disclosure Decision Was Predicated As a Matter of Fact Upon an Interpretation of Section 6103, Did Disclosure, Objectively Tested, Violate a Clearly Established Right Under Section 6103 About Which a Reasonable IRS Agent Would Have Known?**

 The question of whether Stennis's disclosure decision was predicated upon a "good-faith," but erroneous, interpretation of section 6103 does *not* turn on what Stennis subjectively believed.[18] *Anderson v. Creighton*, 483 U.S. at 641, 107 S.Ct. at 3039 (The agent's "subjective beliefs about [the conduct] are irrelevant."). *Diamond*, 944 F.2d at 435. The test is "objective" and turns on what "a reasonable person," in this case a reasonable Criminal Investigation Division agent, would have known about the clearly established law. *Diamond*, 944 F.2d at 435–36 (citing *Rorex v. Traynor*, 771 F.2d at 387) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

 As noted earlier, the "relevant question" "is the objective (albeit fact-specific) question" of "whether a reasonable [special agent with the IRS] *could have believed* [the disclosure of return information] to be lawful, in light of clearly established law and the information [the IRS agent] possessed." *Anderson v. Creighton*, 483 U.S. at 641, 107 S.Ct. at 3039 (emphasis added). Thus, in order for the United States to have liability to the plaintiffs for "bad-faith" disclosure of tax return information, "[t]he contours of the right must be sufficiently clear that a reasonable [IRS agent] would understand that what he is doing violates that right." *Id.* at 640, 107 S.Ct. at 3039.

There are essentially two components to this inquiry. *See, e.g., Cross v. City of Des Moines*, 965 F.2d 629, 631–32 (8th Cir.1992). First, one must assess whether, and to what extent, the law was clearly established. *Id.* Second, one takes the state of the law at the time of the incident and, given what the actor knew as a matter of fact, determines whether a reasonable person (agent) "could have believed," *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039, the action (disclosure) was lawful in light of the law as it existed at the time of the incident. *Cross*, 965 F.2d at 632.

**Was the Right Clearly Established?**

For a right such as a taxpayer's right to have "return information" kept secret under section 6103(a) to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. While the "very action in question" need not have been previously held unlawful, "in the light of pre-existing law the unlawfulness *must be apparent.*" *Id.* (emphasis added).

 I find and conclude that "the contours" of the right to have "return information" kept secret under section 6103(a) were not "apparent" when viewed in the context of an investigative disclosure to a confidential informant pursuant to section 6103(k)(6). In essence, I find that the third requirement for an investigative disclosure—that the disclosure be "necessary" in order to obtain the additional information sought—was (and is) unclear as a standard against which to judge an agent's conduct in the context of this case. In other words, the meaning of this requirement was not "clearly established." There are four reasons for my conclusion.

First, despite the general rule of section 6103(a), Agent Stennis was authorized by another part of section 6103, and the relevant implementing regulation, to make an "investigative disclosure." *See* 26 U.S.C. § 6103(k)(6); 26 C.F.R. § 301.6103(k)(6)–1. Indeed, special agents of the Criminal Investigation Division are told in an IRS manual that "[s]pecial agents are specifically authorized by IRC 6103(k)(6) to disclose return information to the extent necessary to gather data which may be relevant to a tax investigation." *Internal Revenue Manual*

---

**18.** Thus the question is not whether Stennis subjectively believed the disclosure was necessary. Rather, the question is whether a reasonable agent could have believed the disclosure was necessary.

¶ 348.3(1) (5–12–92) (Disclosures for Investigative Purposes).

This authorization flows from Congress's direction that disclosures "for investigative purposes" were to "be made only in such situations and under such conditions as the Secretary may prescribe by regulation." 26 U.S.C. § 6103(k)(6). In response, the Secretary promulgated a regulation that hinged the authority to make an "investigative disclosure" in part upon an assessment of whether the disclosure was "necessary" to obtain otherwise unavailable but important information. 26 C.F.R. § 301.6103(k)(6)–1. According to the Secretary, this "needs" assessment was to be measured against *"the facts and circumstances of the particular case." Id.* (emphasis added).

As a consequence, the Secretary's regulation gives IRS agents little practical guidance as to when it is "necessary" to make an "investigative disclosure" to a confidential informant in order to ensure that the informant will in the future remain available to supply important and otherwise unavailable information to the IRS. Rather, an agent is simply directed to examine the "facts and circumstances of the particular case."

The lack of more precise guidance undoubtedly arises because "[s]ituations in which special agents may have to make such disclosures in order to perform their duties arise *on a daily basis." Internal Revenue Manual* ¶ 348.3(1) (5–12–92) (Disclosures for Investigative Purposes) (emphasis added). As the *Internal Revenue Manual* points out, "this [type of disclosure] occurs *whenever they contact third parties believed to have information pertinent to a tax investigation." Id.* In any event, whatever the reason for the void, the point is that neither the statute nor the regulation gives a special agent definitive direction in a case like this one.

Second, the parties have not provided me with any case law discussing when, and under what circumstances, it is appropriate to apply the "investigative-disclosure" exemption to situations involving a disclosure to confidential informants. Likewise, my own research unearthed no cases applying the "investigative-disclosure" exemption to a case involving a confidential informant. Thus,

special agents lack any direction from the courts on this issue.

Third, plaintiffs and defendants frequently rely upon IRS manuals to prove or disprove "good faith" in suits against the government for alleged wrongful disclosure of return information. *Compare Barrett v. United States,* 51 F.3d 475, 479–80 (5th Cir.1995) (IRS agent's failure to follow explicit manual provision requiring approval of a letter by chief of Criminal Investigation Division established "bad faith") *with Diamond,* 944 F.2d at 435–36 (IRS agent's reliance upon explicit manual provision requiring identification in signature block of letter established "good faith"). Yet neither party in this case claims that any IRS manual addresses one way or the other the issue of disclosure of return information to confidential informants.

My own investigation also failed to uncover any discussion in the pertinent IRS manual regarding when an investigative disclosure may "necessarily" be made to a confidential informant. *See Internal Revenue Manual* ¶ 348.3 (5–12–92) (Disclosures for Investigative Purposes). Rather, the manual generally repeats the language of the regulation without any reference to when a disclosure to a confidential informant is "necessary." *Id.,* ¶ 348.3(2) ("To the extent that necessary information ... may be secured without making a disclosure ... and without seriously impairing a tax investigation, this should be done."). As a consequence, special agents lack specific guidance on this subject from the IRS manual.

Finally, there is evidence in this case that Stennis's disclosure was consistent with IRS custom and practice, but such disclosure decisions are essentially made in an ad hoc fashion. Agent Tinsley, who struck me as extremely credible, competent, professional, and unbiased, testified that "[w]e *routinely* tell confidential informants various aspects [about investigations], one of which could be a search warrant if it's going to affect their safety or have concerns about their well being." (Tr. 127:18–128:3 (emphasis added).) However, according to Tinsley, whether or not a disclosure was "necessary" turned upon the "opinion of the agent." (Tr. 126:23–24.)

While IRS "custom and practice" cannot trump the law, in the absence of clear statutory, regulatory, judicial, or internal procedural direction, what special agents "routinely" do is evidence of what a reasonable agent might think he or she is authorized to do. Although IRS "custom and practice" supported the disclosure action, it provided a reasonable agent with no principled guidance as to whether such a disclosure complied with the law.

In sum, this lack of precise statutory, regulatory, judicial, internal procedural, or practical guidance poses extremely difficult problems for special agents in deciding whether to make an "investigative disclosure" to an informant. An example will illustrate the specific difficulty a reasonable special agent would face in trying to determine whether a disclosure to an informant is "necessary."

I assume (fairly, I hope) that no one would doubt that a special agent would be authorized to make an investigative disclosure of the impending execution of a search warrant if the agent knew beyond all doubt that an informant who possessed important and otherwise unavailable information would be silenced by such things as fear of violence, fear of social disapproval, or fear of civil litigation unless the disclosure was made.[19] In the real world, however, criminal investigators never "know beyond all doubt" what will or will not serve to silence an informant.

Must an agent be 100–percent certain that an informant will be silenced unless a disclosure is made? Or is an acceptable level of certainty a good deal less than a 100–percent confidence level? Indeed, one might reasonably ask whether in this context "necessary" really means (or at least ought to mean) "prudent." The agent is not given precise statutory, regulatory, judicial, internal procedural, or practical direction on the central question of what "necessary" means in the

shadowy world where informants and criminal investigators interact.

## Could A Reasonable Agent Believe Disclosure Complied with Section 6103 in Light of the Law As It Existed at the Time of Disclosure and Given What Stennis Knew As A Matter of Fact?

It is helpful to keep in mind what Stennis told the informant. During the afternoon of January 31, 1990, Stennis warned the informant that "a search warrant [is] going to be executed. Be cautious over the next several days, and if there [are] any problems that occur[ ] or anything that [you] perceive[ ] as a threat from anyone at Jones Oil, ... let [me] know."

It is also advisable to remember that the facts of this case establish that the first two requirements for an "investigative disclosure" under section 6103(k)(5) were satisfied. That is, the information sought from the informants was "with respect to" enforcement of the Internal Revenue Code and there was no other source of information reasonably available.

The specific question then becomes whether, given what Stennis knew, a reasonable agent *could have believed* the warning was "necessary" within the meaning of section 6103(k)(6) in order to obtain the information sought. I am satisfied that a reasonable agent could have believed the warning was "necessary" to preserve and protect the informant for further use by the IRS when Stennis's decision is considered in light of the law as it existed at the time and the information that Stennis possessed. I am thus persuaded for the following reasons:

First, for reasons discussed earlier, the meaning of the word "necessary" was and is unclear. Special agents have no statutory, regulatory, judicial, internal procedural, or practical guidance regarding the level of cer-

---

**19.** The so-called "informer privilege" exists in part because informers not only desire to protect themselves and their families from physical harm, but also to "preclude adverse social reactions and to avoid the risk of defamation or malicious prosecution actions." 1 Wayne R. La-Fave & Jerold H. Israel, *Criminal Procedure* § 3.3, at 203 n. 118 (1984) (quoting 8 J. Wigmore, *Evidence* § 2374 (McNaughton rev. 1961). Stennis knew this. In fact, he was not only

concerned with "bodily injury," but also with "perhaps a lawsuit or what-have-you." (Tr. 257:16–22.) As Stennis said, in that event, "I have a very good source that was gone." (*Id.*) Simply put, an informer may not only be silenced by fear of harm if his or her cooperation is made public, but the informer may also be silenced by the fear of loss of friendship, injury to the informer's status in the community, civil litigation, or similar consequences.

tainty required for a disclosure to be "necessary." To quote Agent Tinsley, the decision as to what was "necessary" was essentially left to "the opinion of the agent." (Tr. 126:23–24.)

Second, it was not uncommon for special agents to divulge information about a search warrant if they were concerned about an informant's "safety" or "well being." (Tr. 127:18–128:3.) In fact, according to Tinsley, it was "routine." (*Id.*) As noted earlier, while common practice cannot overcome the law, it can provide important insight into the question of objective "good faith."

Third, based upon Stennis's own dealings with Jones, as well as those of the informants, a reasonable agent could have had grounds to fear that Terry Jones or someone from his organization might try to retaliate against an informant whose identity was revealed as a result of the execution of the search warrants. Moreover, a reasonable agent could have had a realistic fear that the informants might be silenced as a result of such retaliation. Consequently, a reasonable agent could have warned the informant so the agent could be assured that the informant could be preserved and protected for further use by the IRS.

For example, Stennis himself "had had a number of run-ins with Terry Jones...." (Tr. 164:4–5.) Moreover, "at least one [informant]" told Stennis that "if Jones ever found out about this investigation, there could be some be some adverse action that could be taken against that informant." (Tr. 164:5–9.) Stennis further "knew that there were a number of things that ... happened in the past with regard to [the] informants" when they "crossed paths with Mr. Jones...." (Tr. 257:8–12.) Those "things" were, according to Stennis, "ugly." (*Id.*)

Fourth, the evidence reveals that both *before* and *after* execution of the search warrants, Terry Jones aggressively (if not unlawfully) pursued those whom he suspected of harming his business interests. Such evidence of Jones's behavior confirms that the agent's fear that the informant might be silenced by retaliation was not whimsical or imaginary. Three incidents are relevant to this point.

In 1987 and 1988, before the search warrants were executed, Jones sued Rock Port Oil, R. Lucchino, and others when Rock Port hired former Jones Oil employees and began to compete with Jones in Lincoln, Nebraska. (Tr. 35:23–37:1.) This lawsuit was "fairly contentious." (*Id.*)

After the search warrants were executed, Jones hired a private investigator to "visit with ... Rick Lucchino and Rock Port Oil, the employees, and try to ascertain what had happened here." (Tr. 200:3–201:8.) In order to persuade R. Lucchino to cooperate, the private investigator lied to R. Lucchino about who and what the private detective was investigating. (Tr. 210:10–212:21.) Jones admitted he might have suggested the private investigator lie in order to obtain this information. (*Id.*)

In addition, as their claims in this case demonstrate, Plaintiffs believe they now know who the informants were. As a result, Plaintiffs sued the individuals whom they believed to be the informants. *See* Filing 22 (holding that wrongful-disclosure allegations of Count IV did not state a claim against private individuals and further holding that conspiracy allegations of Count VI did not state a claim). Ironically, this very suit serves to buttress the objective reasonableness of a warning.

Fifth, there was a basis for a reasonable agent to fear that once the search warrants were executed and IRS suspicions thus made evident to Plaintiffs, Jones might be able to discover sufficient information to identify an informant. Thus, a reasonable agent would have had specific reason to warn the informant at the time the warning at issue was given.

As Stennis was pondering his disclosure decision, a reasonable agent would have had no reason to think this court would *not* have entertained and granted a motion to disclose all or a portion of the search warrant affidavit to counsel for Plaintiffs had a motion for return of property been filed on February 1, 1990, the very day the search warrant was executed, or soon thereafter. *See* Fed. R.Crim.P. 41(e). In fact, Terry Jones became aware of the existence of the search warrants at about 7:30 a.m. on February 1,

1990, (Tr. 37:13–38:15), which provided him with plenty of time to seek disclosure of the affidavit on the very day of the search.

This obvious concern about production of the search warrant affidavit in whole or in part was in fact realized. While Plaintiffs were not entirely successful in obtaining a complete copy of the search warrant affidavit, they were able to obtain a redacted version of the search warrant affidavit that revealed a lot of information about what the informants knew and how they knew it. (Ex. 3A.) As a matter of fact, from the redacted search warrant affidavit and other investigations Plaintiffs conducted (including hiring private investigators and taking discovery depositions from the suspected informants), Plaintiffs were able to identify the informants to their satisfaction. (Tr. 208:8–209:5.)

Sixth, at least two objectively valid reasons support the decision to couple a "be-cautious" admonition, which by itself might not have been a disclosure of return information, with the additional disclosure that "a search warrant [is] going to be executed."

Initially, it is fair to characterize the disclosure to the informant as a "warning."[20] For the reasons articulated earlier, a reasonable agent could have believed that a warning was necessary and justified under the provisions of section 6103(k)(6). By definition, a "warning" is "the action or fact of putting one on his guard by intimating danger, evil consequences, or penalties *from an act or course of conduct*." *Webster's Third New Int'l Dictionary* 2577 (1986) (emphasis added).

It seems perfectly sensible both to "intimate danger" and to identify "the act or course of conduct" that created the danger. Indeed, it could fairly be argued that without such identification the informant would lack sufficient information to take meaningful precautions because the informant would not know what "act or course of conduct" was likely to create the danger. Thus, at the most fundamental level, the subject disclosure gave the informant a meaningful context

for understanding what a reasonable agent could have been concerned about.

More specifically, according to Stennis, the informants were situated "fairly close to that general area" of the Jones Oil premises. (Tr. 162:23–163:9.) A reasonable agent would thus have had good reason to make sure the informant stayed far away from the business premises of Jones Oil while the search warrants were being executed. Only by disclosing the impending execution of the search warrants could an agent be sure the informant would not place himself or herself at or near the premises of Jones Oil during the execution of the search warrants.

Obviously, a reasonable agent would want to keep the informant physically separated from Terry Jones during this period of time to ensure that Jones did not come to suspect the identity of the informant because of his or her presence at or near the scene of the search. Also, a reasonable agent would have no way of knowing whether Jones might not guess or otherwise discover the identity of the informant that very day; hence the agent would want the informant to stay far away from the premises of Jones Oil so as to avoid retaliation if the informant's identity were discovered.

In sum, objectively testing the disclosure decision against the facts Stennis possessed and the law as it existed, I am convinced that a reasonable agent could have believed "in good faith" that the disclosure Stennis made complied with section 6103(k)(6). Plaintiffs have thus failed to prove that the United States acted in "bad faith."

### 5. Summary

Agent Stennis disclosed to a confidential informant on January 31, 1990, that "a search warrant [is] going to be executed. Be cautious over the next several days, and if there [are] any problems that occur[ ] or anything that [you] perceive[ ] as a threat from anyone at Jones Oil, . . . let [me] know."

---

**20.** It should be noted that while the exact language of the disclosure has great significance for this litigation, a reasonable agent might not have phrased the warning with the precision of a lawyer. After all, a reasonable agent's focus would have been on giving a meaningful warning, not on the correct legal phrasing of that warning. As a result, one should be cautious when dissecting the wording of the warning.

This disclosure violated the general rule provided in section 6103(a) because it was a disclosure of "return information." While two of the three requirements for an "investigative disclosure" under section 6103(k)(6) exist, the evidence is not sufficient for me to conclude that the disclosure was in fact "necessary" to obtain the information sought. Thus, the disclosure is not exempted by the provisions of section 6103(k)(6) because not all three requirements for an "investigative disclosure" can be found to exist.

However, I also believe the principles of section 6103(k)(6) motivated Stennis's decision and that he therefore interpreted section 6103 when he made his disclosure decision. Although Stennis's decision was based upon an apparently erroneous understanding of section 6103(k)(6), a reasonable agent could have believed "in good faith" that the disclosure Stennis made complied with section 6103(k)(6). This being true, under the provisions of 26 U.S.C. § 7431(b), the United States has no liability to Plaintiffs.

### B. Property Claim

This claim is easily resolved. There is undisputed evidence in the record that all property seized was returned to Plaintiffs. Tinsley testified that all items seized by the IRS on February 1, 1990, have now been returned to Plaintiffs. (Tr. 216:10–17; 219:16–220:15.) Terry Jones was not able to articulate any specific item of property that was not returned. (Tr. 196:4–197:21.) As a result, there is no factual basis for Plaintiffs' property claim.

Accordingly,

IT IS ORDERED that judgment shall be entered by separate document providing in substance that "based upon the previous memoranda and orders of this court, judgment is hereby entered for Defendants, and against Plaintiffs, providing that Plaintiffs shall take nothing."